<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROBERT LYNN, | |
| Plaintiff, | No. 22cv4655 (EP) (LDW) |
| v. | **OPINION** |
| THE BANK OF NEW YORK MELLON & THE BANK OF NEW YORK MELLON CORPORATION, | |
| Defendants. | |

**PADIN, District Judge.**

Plaintiff Robert Lynn ("Lynn" or "Plaintiff"), a former employee of the Bank of New York Mellon (the "Bank"), brings suit against the Bank and the Bank of New York Mellon Corporation (the "Corporation") (together "Defendants"), for alleged race discrimination and retaliation during his employment, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"), and the New Jersey Law Against Discrimination, as amended, N.J. Stat. Ann. § 10:501, *et seq.* ("NJLAD") D.E. 1 ("Complaint" or "Compl."). Defendants move for summary judgment on all three claims under Fed. R. Civ. P. 56(a). D.E. 51-2 ("Motion" or "Mot."). Defendants also seek summary judgment on Lynn's claim for punitive damages. *Id.* The Court decides the matter without oral argument. *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b). The Court will **GRANT** Defendants' Motion.

# I.    FACTUAL BACKGROUND[1]

## 1.    *Lynn's initial employment as a Portfolio Lead*

Lynn was employed by the Bank from April 22, 2019 to September 9, 2021.[2]  Defs. Facts ¶¶ 1-2; Pl. Facts ¶¶ 1 n.2, 4; Defs. Resp. Facts ¶ 1.  Lynn was hired as a Senior Group Manager in the Asset Servicing Technology division ("Portfolio Lead") a Director-level role known within the Bank as an "M-level" role.[3]  Defs. Facts ¶¶ 6-7; Pl. Supp. Facts ¶ 10.  An M-level Director position is widely viewed within the bank as an elevated position of leadership, providing higher compensation, advanced benefits, authority to make decisions, visibility to senior management,

---

[1] The facts are drawn from Defendants' Statement of Undisputed Material Facts, D.E. 51-1 ("Defs. Facts"); Plaintiff's Responsive Statement of Material Facts, D.E. 52-2 ("Pl. Facts"); Plaintiff's Supplemental Statement of Disputed Material Facts, D.E. 52-3 ("Pl. Supp. Facts"); Defendants' Response to Plaintiff's Supplemental Statement of Disputed Material Facts, D.E. 53-1 ("Defs. Resp. Facts"); and the exhibits referenced in these submissions.  "[A] party asserting a fact is (or cannot be) genuinely disputed must support the assertion by (A) 'citing to particular parts of materials in the record . . .' or (B) 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'"  *Dor v. TD Bank*, No. 21-18955, 2023 WL 9017558, at *9 (D.N.J. Dec. 29, 2023) (quoting Fed. R. Civ. P. 56(c)(1)).  Additionally, where parties opposing summary judgment disagree with the movant's statement of material facts, "they must indicate 'each material fact in dispute and cit[e] to the affidavits and other documents submitted in connection with the motion.'"  *Id.* (quoting L. Civ. R. 56.1(a)).  Facts unsupported by citations to record evidence are not considered and responses that do not cite to record evidence are deemed admissions.  *See Vorhies v. Randolph Township Bd. of Educ.*, No. 16-587, 2020 WL 278761, at *1 n.2 (D.N.J. Jan. 16, 2020).  A standalone fact without reference to a dispute denotes that the Court has deemed the factual allegation undisputed.

[2] The parties dispute whether Plaintiff was employed only by the Bank or by both the Bank and the Corporation.  Pl. Facts ¶ 1 n.2.  Defendants argue "that because Plaintiff was employed by the Bank only, the Corporation is entitled to summary judgment.  Mot. at 1 n.1.  However, the Court need not address this argument here as Defendants have waived the argument by only referencing it in passing in a footnote.  *See Hilb Grp. of New Jersey, LLC v. Musuka*, No. 23-1246, 2024 WL 1461197, at *6 (D.N.J. Apr. 4, 2024) (citing *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997)).  Furthermore, addressing this argument is unnecessary as it does not change the outcome of this Opinion.

[3] In reference to the internal job grade of "M."  Defs. Facts ¶ 7.

and, has a "level of gravitas" within the Bank community. Defs. Facts ¶ 8 (citing D.E.s 51-4, 52-8 ("Lynn Dep.") at 42:16-21;61:10-64:10, 93:5-20, 186:22-187:2).[4]

According to Shawe, the Portfolio Lead role is a "governance role that ensures that the program managers follow the development life cycle and keep a system called PPM, which is a project and program management system, up to date and in line with the procedures and policies of the bank." D.E. 52-10, Shawe Dep. at 68:14-20. As a Portfolio Lead, Lynn provided those governance services for approximately 100 programs, and 300 projects, with an overall budget of approximately $530 million. *Id.* at 79:6-80:10-24. As a Portfolio Lead, Lynn did not "own" the portfolio, rather his responsibilities were to make sure that the portfolio followed various governance processes and procedures. D.E. 51-8, Rogers Dep. at 152:14-153:3.

From August 2019 through April 2021, Lynn reported to Shawe. Defs. Facts ¶¶ 9-11, 48; Pl. Facts ¶ 48. Out of Shawe's ten direct-reports, Lynn was the only person who identified as Black. Pl. Supp. Facts. ¶ 14. In early 2021, Shawe conducted Lynn's 2020 year-end review and found that Lynn "achieve[d] or met expectations," the same rating Lynn received each prior year from Shawe. Defs. Facts ¶ 24.

On or about January 22, 2021, Shawe met with Lynn to discuss his year-end review and told Lynn that he understood the "horizontal aspects of the role very well" but that he "need[ed]

---

[4] Lynn claims he was responsible for governing the budget and performance of the portfolio of all the programs and projects within the Asset Servicing Technology Division, including a $530 million dollar budget, 100 programs, and 300 projects. Pl. Supp. Facts. ¶ 11. However, the parties do not provide the Court with the deposition portions cited by Lynn in this paragraph. The only evidence the parties direct the Court to, *and* provide the Court with, on this topic are certain excerpts from the deposition of Daniel Shawe (Lynn's manager from August 2019 through April 2021) and Laura Rogers (Lynn's manager for his next role at the Bank).

to understand the vertical elements and dive deep and understand what the program managers under [Lynn] are actually doing."[5]  Defs. Facts ¶ 27.

> ### 2.    *Lynn accepts a new M-Level Director "Program Manager" role*
>
> #### a.    *Defendants' version*

According to Defendants, Shawe recommended that Lynn seek an opportunity as an enterprise or senior program manager to gain the experience Shawe believed Lynn needed to advance his career.  Defs. Facts ¶ 29.  According to Defendants, Shawe volunteered to help Lynn find a new role and, after providing Lynn a list of open M-level Director roles, identified an M-level position that he believed "perfectly matched" Lynn's development needs.  Defs. Facts ¶¶ 31-33.  The position was a newly created role with the title of "Senior Group Manager, Program Management" ("Program Manager") that reported to Laura Rogers, the Chief Operating Officer ("COO") for the Architecture and Data group.  Defs. Facts ¶¶ 36-37.  According to Defendants, Rogers had not finalized the job duties and responsibilities to be assigned to the position.  Defs. Facts ¶ 37.

According to Defendants, Lynn sought out this position, and, on March 24, 2021, was offered the job over White female who was previously a front-runner, and voluntarily accepted the position.  Defs. Facts ¶¶ 38-42.  The parties do not provide clear evidence on the exact date Lynn accepted the offer, but according to Shawe, it was before late March.  D.E. 41-9, Shawe Dep. at 140:1-141:17, 167:11-170:7, 210:13-211:1.

Shawe testified that it was only *after Lynn accepted his new role* that he asked Shawe what would happen if he didn't take that role, and at that point, Shawe offered for him to return to his

---

[5] This was the first time Lynn heard this feedback and was surprised to hear it.  Pl. Facts ¶ 27.

old role for 6 months until he could find something new.  Defs. Facts ¶ 47 (citing D.E. 51-9, Shawe

Dep. at 140:1-141:17, 167:11-170:7, 210:13-211:1).

<em>b.    Lynn's version</em>

Lynn contends that the duties and responsibilities of the Program Manager role were

defined by the job posting.  Pl. Facts ¶ 37 (citing D.E. 52-11, Program Manager Job Posting).

However, there is no dispute that, as a Program Manager, Lynn continued to hold an M-level

Director position and continued receiving the same salary and benefits as he did as a Portfolio

Lead.  Defs. Facts ¶ 49.  There is also no dispute that Lynn had two direct reports under him who

he managed as a Program Manager.  Defs. Facts ¶ 105.

According to Lynn, Shawe told him that he would not be able to continue as a Portfolio

Lead and needed to transition into a Program Management position.  Pl. Facts ¶ 29 (citing 52-27

("Lynn Decl.") ¶ 4); Pl. Supp. Facts. ¶ 16 (citing Lynn Dep. at 177:17-22; D.E. 52-10, Shawe Dep.

at 166:20-167:9).  Lynn states that Shawe told him he had three to six months to find a new role

as Program Manager.  Lynn Decl. ¶ 4.  Lynn "understood" that this meant he would be terminated

if he did not find a Program Manager role within that time.  Lynn Decl. ¶ 4.

However, Shawe's testimony cited by Lynn only states that Shawe thought Lynn's role

and reporting structure needed to be changed.  Pl. Supp. Facts. ¶ 17 (citing D.E. 52-10, Shawe

Dep. at 166:20-167:9).  Lynn's own deposition testimony only states that Shawe did not help him

find a new position.  Lynn Dep. at 177:17-22. [6]  In response to Shawe's testimony that he only told

Lynn *after* Lynn accepted his new role that he could only return to his old role for 6 months until

he found something new, Defs. Facts ¶ 47,  Lynn only cites his own declaration that states Shawe

---

[6] Lynn also cites to 147:21-25 in his deposition but neither party has provided the Court with this deposition excerpt.

told him that he had three-six months to find a new role as Program Manager, that this occurred at "some point after" Shawe told Lynn he could no longer continue in his Portfolio Lead role, and that Lynn understood this to mean he would be terminated if he did not find a Program Manager role within that time. Pl. Facts ¶ 47 (citing Lynn Decl. ¶ 4). In other words, Lynn does not point to any non-conclusory record evidence that disputes Shawe's testimony that it was only *after* Lynn already accepted his new role as Program Manager that he told Lynn he could not return as a Portfolio Lead for longer than six months.

### 3. Lynn's work as a Program Manager and initial complaint

Lynn was not satisfied with his new role as Program Manager. As a Project Lead, Lynn provided governance services for 100 programs and 300 projects; but as Program Manager, he managed only three projects. Defs. Facts ¶ 50; Pl. Supp. Facts ¶ 23. Rogers (Lynn's new manager) viewed these three projects as important components of the Data Masters Enterprise Program. Defs. Facts ¶ 50. However, Lynn viewed these projects as not part of a "true program" because they were "unbudgeted" and had undefined objectives that Rogers could not articulate. Pl. Supp. Facts ¶ 23 (citing Lynn Dep. at 210:17-211:4). Lynn felt that he was "being pushed into this amorphous position" as a way to "get [him] out of the bank" because, in his view, the job he was asked to perform did not match the role he applied for. Pl. Facts ¶ 51 (citing Lynn Dep. at 261:6-265:6).

As one of his final tasks in transitioning into the Program Manager role, Lynn worked with Shawe and others on a PowerPoint presentation for a Monthly Business Review ("MBR") meeting among top-level executives. Defs. Facts ¶ 52. On April 27, 2021, without notifying anyone, Lynn inserted a footnote on page 32 of a 152-page PowerPoint presentation that read:

> Note: AST is an unsafe environment for black employees to advance
> and to expand their managerial skills. Example: the Asset Servicing
> CIO has no black management direct reports, and the COO, on

> 8/24/20, told the black AST portfolio lead that the COO does "not believe in black lives matter." By January, the COO gave this portfolio lead a "meets" rating but asked him to leave ASGOT for a demotion 2 levels to a project manager position. The GOTO COO, despite aggressively promoting a D&I agenda verbally, has no black direct reports.

*Id.* ¶ 54 (citing Lynn Dep. at 238:14-244:6; D.E. 51-9, Shawe Dep. at 219:15-222:2; D.E. 51-5, P-10 ("PowerPoint Presentation") at -190); *id.* ¶ 55. Lynn had not previously reported the allegations expressed in the footnote to Human Resources or anyone else at the Bank. *Id.* ¶ 56. According to Lynn, he did not know how to properly raise complaints of this sort pursuant to Defendants' policies. Pl. Facts ¶ 54 (citing Lynn Dep. at 245:7-21).[7]

After another employee flagged the footnote for Shawe, and despite viewing the footnote as "100 percent not factual," Shawe escalated the footnote to Human Resources. Defs. Facts ¶¶ 57-58. Human Resources subsequently investigated the allegations raised in Lynn's footnote and found many to be unsubstantiated. Defs. Facts ¶¶ 59-64. On or about May 20, 2021, the Bank closed out its investigation as unsubstantiated. Defs. Facts ¶ 72; Pl. Facts ¶ 72.[8]

In mid-May, Rogers began to hear from Lynn's colleagues about issues with Lynn's job performance—specifically that he was not engaged, did not understand the details of his role and assigned programs and projects, and was not satisfactorily acting as Program Manager. Defs. Facts ¶¶ 77-78.[9]

---

[7] Lynn also claims he thought that adding the footnote to the PowerPoint Presentation was an effective way to address his concerns but does not provide the Court with the deposition testimony he cites that purportedly supports this statement. Pl. Facts ¶ 54.

[8] Lynn disagrees with the merits of Human Resources' conclusion. Pl. Facts ¶ 72.

[9] Lynn points out that Rogers did not know of any contemporaneous documentation of these concerns. Pl. Facts ¶ 78 (citing D.E. 52-12, Rogers Dep. at 241:12-24). However, Plaintiff does not point to any evidence in the record contradicting Rogers' testimony, so the Court deems it undisputed. *Id.*

4.    *Lynn expresses a desire to transition into a data taxonomy role*

On May 19, 2021, Lynn emailed Eric Hirchhorn to "follow up on [a] Teams message" that he sent to Eric Hirschhorn, Chief Data Officer, on May 14 regarding a "need to locate and / or create a position for an enterprise-wide product taxonomy expert" (the "Data Taxonomy Position") and asking that he be considered for that role.  D.E. 51-5, P-13 at -2688.  On May 24, 2021, Yinghua Zhou, a member of Hirschhorn's team, spoke with Lynn about the potential role and, after the interview, she informed Hirschhorn that Lynn "has the relevant skills and right mindset (i.e. persistence on accurate and clear definitions)" and that "[h]is experience can help us build the centralized domain ownership to drive taxonomy adoption by LOBs."  Pl. Supp. Facts. ¶ 52 (quoting D.E. 51-5, P-13 at -2687).  Zhou concluded by asking Hirschhorn "Can I hire him? 😊."  *Id.*  Hirschhorn responded that he is "okay in principle with this" but wanted Lynn to go through additional interviews.  Pl. Supp. Facts. ¶ 53 (quoting D.E. 51-5, P-13 at -2687).

On May 25, 2021, Brad Beadon, a member of Hirschhorn's team, wrote to others on Hirschhorn's team that Lynn "joined Laura Rodgers team . . . just a few weeks ago," but that he "is struggling to fit in and adapt, doesn't seem to work well with ambiguity, can[']t get into the game unless he has all the details clearly laid out for him[,] [] seems over sensitive to management hierarchy (resistance to working with Jeff as he is a consultant and not an FTE)," and that Beadon had "yet to see any productivity."  D.E. 51-5, P-13 at -2686.  Zhou ultimately decided not to pursue Lynn as a candidate for the potential Data Taxonomy Position.  Defs. Facts ¶ 88.  Zhou was unaware of Lynn's footnote in the PowerPoint Presentation or of any complaint of race discrimination or retaliation by Lynn.  Defs. Facts ¶ 91.

Ultimately, the Data Taxonomy Position was never created.  Defs. Facts ¶ 94.  Instead, approximately four months later, Zhou created at least three different L-level positions (below the

8

M-level status held by Lynn)—Lynn never applied to any of these L-level positions.  Defs. Facts ¶ 94; Pl. Facts ¶ 94.

                         *5.*         *Lynn files an EEOC Complaint*

On June 17, 2021 Lynn filed a Charge of Discrimination with the EEOC.  D.E. 51-5, P-18 (the "EEOC Complaint") at -713; Defs. Resp. Facts ¶ 59 n.4.  After Lynn filed the EEOC Complaint, he was ignored and looped out of conversations.  Pl. Supp. Facts. ¶ 68.

                         *6.*         *Lynn's colleagues report continued issues with Lynn's performance and Lynn receives an "off-track" mid-year performance review and a PIP*

Lynn's colleagues continued to observe what they viewed as performance issues.  For example, Lynn's colleague Jeff Silver testified that Lynn did not manage expectations or interact well with others and was confrontational.  Pl. Facts ¶ 99.  Silver had no knowledge of Lynn's footnote, EEOC Complaint, or any complaint of race discrimination by Lynn.  Defs. Facts ¶ 100.

Defendants have two annual performance reviews: (i) a formal year-end review in January, and (ii) an informal mid-year review in June or July.  *Id.* ¶ 106.  On June 24, 2021 Rogers texted a Human Resources representative, Jeanne Mason, conveying additional negative performance feedback: "I'm getting a lot of pushback on [Lynn] and his performance.  Bottom line is he is not performing at an M level."  Pl. Supp. Facts. ¶ 62.  The same day, Rogers decided to issue Lynn an "off-track" mid-year performance rating.  *Id.* ¶ 63.

On August 17, 2021, Rogers delivered Lynn his mid-year performance review, D.E. 51-5, P-21 ("Mid-Year Review") and an "Informal Performance Improvement Plan, D.E. 51-5, P-23 ("PIP").  Defs. Facts ¶ 109.[10]  The Mid-Year Review identified various performance issues.  For example, Rogers wrote in the Mid-Year Review that Lynn "has been tentative in owning his full

---

[10] The parties dispute whether the PIP was formal or informal and whether it has a "direct" impact on compensation or promotion.  Pl. Facts ¶¶ 106-109.  The Court notes that the PIP itself is titled "Informal Performance Improvement Plan."  PIP.

portfolio" and that "some of the details are too technical for him to track." Mid-Year Review at -681. Rogers also wrote that Lynn "had difficulty gaining the trust of his technology partners" due in part to Lynn "not always managing the conversations to the level of the audience" and by "asking questions that have recently been covered, that he should already have . . . knowledge of . . . ." *Id.* Further, according to Rogers, "[t]hrough mid-year, [Lynn] had not dug into a lot of the details and completed major deliverables for his program" and that she received feedback that Lynn did not appear "invested" in the overall program outcomes and does not have sufficient command of the details of his projects. *Id.* at -682. The Mid-Year Review concludes that Lynn's progress was "off-track." *Id.* at -680.

The PIP identified four performance improvement areas: (1) "Manage Communications to the Audience Level," (2) "Own Portfolio Outcomes," (3) "Manage and resolve risks, issues, and dependencies," and (4) "Become a Subject Matter Expert for programs, delivery dates, and technology involved." PIP at -2801. The parties agree that Rogers had previously discussed at least some of these issues with Lynn. Defs. Facts ¶ 112; Pl. Facts ¶ 112.

On August 19, 2021, Lynn emailed Rogers explaining his position as to why he believed he was performing adequately. D.E. 51-6, P-41 (the "August 19 Email"). He also repeated his allegation that he is continuing to be subjected to race discrimination and retaliation and that he viewed his "off-track" performance rating and PIP as the latest example of such retaliation. *Id.* at -684-85.[11]

### 7. *Lynn is terminated*

In April 2021, a few weeks after Lynn was offered his new Program Manager role, the Bank announced a reorganization of the Asset Services and Technology group, which included a

---

[11] As discussed *infra*, Section IV(A)(2)(b), Lynn disputes some but not all of the specific performance criticisms levelled against him.

merger of the Data Technology team, on which Rogers and Lynn worked, and the enterprise data management ("EDM") team, which Hirschhorn led (the "2021 Reorganization"). Defs. Facts ¶¶ 119, 121. Defendants claim that the reorganization was not set to be executed until after Labor Day in September 2021 and that planning for the reorganization was "fluid and being determined throughout the interim period of April 2021"; but Lynn claims that the Data Technology team completed its move to EDM in late August 2021. Defs. Facts ¶ 120; Pl. Facts ¶ 120.

Rogers began thinking about the EDM team's post-merger structure should be. *Id.* ¶ 122; Pl. Facts ¶ 122. After attending a budget meeting on August 31, 2021, Rogers decided that she needed to eliminate a position and selected Lynn for termination. Pl. Supp. Facts ¶ 79; Defs. Resp. Facts ¶ 79 (citing D.E.s 51-8, 52-12, Rogers Dep. at 45:14-46:3, 397:6-398:9, 435:9-444:15). Lynn was notified of the decision to terminate him on September 9, 2021. Defs. Facts ¶ 136.

Rogers testified that she considered four M-level directors in program manager roles for elimination from her team. *Id.* ¶ 125. But Lynn claims that Rogers did not actually consider others for potential termination. Pl. Facts ¶ 125; *see generally* Pl. Facts ¶¶ 126-133. Ultimately, Lynn was one of 94 individuals employed by Defendants who were selected for elimination as part of the 2021 Reorganization. Defs. Facts ¶ 141.[12]

The parties dispute the details of how Lynn's role was "filled" after his termination. According to Defendants, Lynn's work was "distributed to others," including Silver, Srinivas Chilluvudi, Michael Maresca, and Lynann Nehls. Defs. Facts ¶ 138. According to Lynn, Maresca

---

[12] Lynn does not dispute this fact but quips that "Defendants provided no information as to the identity of these 94 employees" and suggests that this fact is irrelevant. Pl. Facts ¶ 141. However, Plaintiff argues that he was the "only employee terminated at that time out of over a thousand employees impacted by the reorganization" despite citing to testimony that does not support that proposition. D.E. 52 ("Opposition" or "Opp'n") at 18; Pl. Supp. Facts ¶ 83. Therefore, the Court deems it undisputed that 94 individuals were selected for termination as part of the overall reorganization actions spanning Technology and other business units in September 2021.

and Nehls initially "assumed [his] job duties," but, when Nehls received a new job after Lynn's termination, Maresca assumed all of Lynn's job duties. Pl. Facts ¶ 138. Maresca is a white individual. Pl. Supp. Facts ¶ 97. The parties agree that previously hired employees took over Lynn's responsibilities—not new hires. Defs. Facts ¶ 138; Pl. Facts ¶ 138.

## II.    PROCEDURAL BACKGROUND

Lynn filed his Complaint on July 20, 2022. Compl. Defendants answered on September 20, 2022. D.E. 5. Fact discovery concluded on February 15, 2024. D.E. 38. Defendants filed their Motion for summary judgment on June 17, 2024. Mot. Lynn opposes. Opp'n. Defendants reply. D.E. 53 ("Reply").[13]

## III.    LEGAL STANDARD

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment,[14]" *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), and statements of undisputed material facts may not "primarily

---

[13] The Court denied Lynn's request to file a sur-reply. D.E. 55.
[14] This rule extends to conclusory self-serving deposition testimony. *See Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011).

rely on speculation and legal conclusions" or "fail[] to genuinely dispute the facts[.]" *Buxton v. Dougherty*, 821 F. App'x 70, 71 n.2 (3d Cir. 2020).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Unsworn allegations in memoranda and pleadings or allegations questioning the credibility of witnesses are insufficient to defeat a properly supported summary judgment motion. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV.    ANALYSIS

Lynn alleges violations of Title VII (Count I), Section 1981 (Count II), and NJLAD (Count III) stemming from alleged race discrimination, retaliation, and harassment. *See generally* Compl. The legal standards governing these causes of action are similar between the statutes and are

outlined below. Defendants move for summary judgment on all three counts and for Lynn's claim for punitive damages. Mot. The Court agrees that Defendants are entitled to summary judgment on all three counts and therefore need not address Defendants' argument on punitive damages.

### A. Discrimination under Title VII, Section 1981, and NJLAD

Counts I, II, and III allege race discrimination under Title VII, Section 1981, and the NJLAD, respectively. Compl. ¶¶ 93-111. As discussed below, the Court finds that Defendants are entitled to summary judgment on all of Lynn's discrimination claims.

The same legal framework governs claims for race discrimination under all three statutes. *See Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) ("[Section 1981] claims are subject to the same analysis as discrimination claims under Title VII."); *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 180 (3d Cir. 2020) ("Claims brought under NJLAD and § 1981 are analyzed under the same framework.").

The *McDonnell Douglas* burden shifting framework applies here. *See Castleberry*, 863 F.3d at 263; *Ali*, 957 F.3d at 180. Under the *McDonnell Douglas* framework, a plaintiff must first establish the requisite *prima facie* elements of his claim; if he achieves that, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Castleberry*, 863 F.3d at 263 (cleaned up). If the employer articulates such a reason, then the burden shifts back to the plaintiff to establish that the "employer's stated reason for the adverse action was an excuse, or pretext, for why the action was eventually taken." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)).

To show pretext, the "plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative

14

cause of the employer's action." *Ortiz v. Cedar Crest College*, 764 F. App'x 257, 259 (3d Cir. 2019) (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).[15]

Under the first prong of the *Fuentes* test, it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus." *Hennessey v. Dollar Bank, FSB*, 833 F. App'x 961, 965 (3d Cir. 2020) (cleaned up).   It is only discrimination on the basis of race that is of concern here, not discrimination for any other reason.   *See id.*   "[T]he courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.   No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the [law] does not interfere.'"   *Id.* at 966 (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995)).

The plaintiff must instead "'demonstrate such weaknesses, impossibilities, inconsistencies, incoherencies, or contradictions in [the defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence.'"   *Harvey v. Int'l Reading Ass'n, Inc.*, 838 F. Supp. 2d 244, 251-52 (D. Del. 2012) (quoting *Fuentes*, 32 F.3d at 765) (emphasis in original).   In other words, the plaintiff must show that the proffered reason was "not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'"   *Id.* at 252 (quoting *Jones v. School Dist. Of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1999)).   Furthermore, the mere fact of a discrepancy or inconsistent statement does not, "as a matter of law, render a witness's testimony incredible."   *Steele v. Pelmor Labs., Inc.*, 725 F. App'x 176, 180 (3d Cir. 2018) (cleaned up).   "The mistakes that witnesses make in all innocence must be

---

[15] As Lynn points out, Defendants incorrectly state that *Ortiz* holds that the plaintiff must show *both* that Defendant's proffered reason is false and that the true reason is discrimination based on the plaintiff's protected characteristics.   Opp'n at 7 n.3 (citing Mot. at 19-20).

distinguished from slips that . . . show that the witness is a liar or his memory completely unreliable." *Id.* (cleaned up).

Under the second prong of the *Fuentes* test, a plaintiff may show an inference of pretext by pointing to "1) previous discrimination against the plaintiff; 2) discrimination by [the defendant] against other persons; [or] 3) whether [the defendant] has treated other similarly situated employees not within the protected class more favorably." *Harvey*, 838 F. Supp. 2d at 252. (citing *Simpson v. Kay Jewelers Div. of Sterling, Inc.*, 142 F.3d 6).

1.    *Lynn satisfies his prima facie burden for race discrimination based on his termination from his role as Program Manager*

The *prima facie* elements of a discrimination claim under all three statutes at issue here are (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position he sought to obtain or retain; (3) the plaintiff suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of unlawful discrimination. *See Flores v. Danberg*, 706 F. App'x 748, 752 (3d Cir. 2017); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 539 (D.N.J. 2022). The bar to establish a *prima facie* case of employment discrimination is "low." *Scheidemantle v. Slippery Rock Univ. State Sys. Of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).

Defendants do not appear to challenge whether Lynn is a member of a protected class and whether he was qualified for the Program Manager position he sought to retain. *See generally* Mot. Defendants also do not dispute that terminating Lynn from his role as Program Manager was an adverse employment action. *See generally id.*[16] However, Defendants *do* argue that Lynn has

---

[16] Defendants do argue that Lynn's alleged "demotion" from Portfolio Lead to Program Manager was not an adverse employment action. *Id.* at 21-23. This argument is addressed *infra*, Section IV(A)(3).

not made a *prima facie* showing that his termination occurred under circumstances that could give rise to an inference of unlawful discrimination. *See id.* at 21-23, 26-35. The Court disagrees and finds that factual issues exists as to whether Lynn has established his *prima facie* case.

Defendants argue that the decision to terminate Lynn's employment did not occur under circumstances that could give rise to an inference of discrimination because his termination was based on unsatisfactory performance. Mot. at 26-35. However, this is an argument that goes to whether Defendants have proffered a legitimate motivation for terminating Lynn, which the Court addresses below. Lynn argues that because he was replaced by a white individual, Maresca, he has demonstrated a dispute of fact as to an inference of discrimination. Opp'n at 8-9 (citing Pl. Supp. Facts. ¶¶ 97-98).

One of the "common circumstances" giving rise to an inference of unlawful discrimination is replacing the plaintiff with someone not in the protected class. *May v. PNC Bank*, 434 F. Supp. 3d 284, 296 (E.D. Pa. 2020). Although there is no dispute that at least some of Lynn's job duties were taken on by Maresca, Pl. Supp. Facts ¶ 97; Defs. Resp. Facts ¶ 97, the scope of Lynn's work that was assumed by Maresca is disputed. Defs. Facts ¶ 138; Pl. Facts ¶ 138. Therefore, there is a dispute of material fact as to whether Lynn satisfies his *prima facie* burden.

        2.    *A rational factfinder could not conclude that Defendants' proffered reasons for terminating Lynn were merely pretextual*

Lynn does not dispute that Defendants have rebutted his discrimination claim by pointing to nondiscriminatory reasons for his termination—the 2021 Reorganization and Lynn's performance issues. Lynn argues that the 2021 Reorganization and his job performance were merely pretextual reasons for firing him and that a fact finder could conclude that a discriminatory

motivation was instead the driving force.  Opp'n at 16-22.[17]  The Court finds that Lynn has not met his burden to show a dispute of material fact that, if found in Lynn's favor, would allow him to prevail in his race discrimination claim based on his termination.

Lynn argues that both of Defendants' proffered legitimate reasons for his termination are false.  Opp'n at 17-22.[18]  If the "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose," then the issue is one for the factfinder.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *see also Ortiz v.*, 764 F. App'x at 259; *Tomasso v. Boeing Co.*, 445 F.3d 702, 710 (3d Cir. 2006).  Lynn may rely on "circumstantial evidence that is probative of intentional discrimination."  *Reeves*, 530 U.S. at 147.  However, the evidence Lynn points to cannot support an inference that Defendants' proffered reasons for terminating Lynn are merely pretextual.

        a.       *The 2021 Reorganization.*

Lynn argues that evidence exists that could establish that the 2021 Reorganization was not the real reason for his termination.  Opp'n at 17-20.  Lynn suggests that evidence of pretext exists because Rogers had not considered Lynn for termination prior to August 31, 2021 and that the 2021 Reorganization was large and began in the Spring of 2021.  *Id.* at 17-18.  Lynn also argues that Lynn was the only employee terminated in the 2021 Reorganization but does not cite record evidence that supports this statement.  Lynn cites a document referred to as "P-1," but neither party provides the Court with this document so the Court cannot consider it directly.  Pl. Supp. Facts ¶

---

[17] In Section IV.B.2 of Lynn's Opposition, he argues that Section IV.B.1 of the Opposition refers to pretext evidence to disbelieve Defendants' proffered reasons for terminating him and instead harbored discriminatory and retaliatory biases against Plaintiff.  Opp'n at 16.  However, Section IV.B.1 includes only evidence relevant to Lynn's retaliation claim and thus will be addressed below.

[18] It is not clear whether Lynn also asserts, alternatively, that he also meets the second prong of the *Fuentes* test.  The Court analyzes both prongs here.

83.  However, Lynn also cites Rogers' deposition testimony where his counsel reviewed P-1 with Rogers.  *Id.* (citing D.E. 52-12, Rogers Dep. at 109:21-114:4).  According to Rogers, P-1 refers to separation pay and benefits that were offered to eligible employees selected for termination in a specific business unit—the Architecture and Data Business Unit ("BUD").  52-12, Rogers Dep. at 109:10-110:13.  Rogers specifically testified that this was "not the combined" organization but rather "a specific business unit designation."  *Id.* at 110:14-17.  Moreover, Rogers testified that, even within BUD, there was another employee selected for termination in a prior phase of the 2021 Reorganization.  *See id.* at 111:11-12.  It is undisputed that Lynn was one of 94 individuals employed by Defendants who were selected for elimination as part of the 2021 Reorganization. Defs. Facts ¶ 141; *see also supra* n. 12.  Rogers did *not* testify that Lynn was the only employee terminated as part of the 2021 Reorganization, but merely that she was not *aware* of other terminations as part of the 2021 Reorganization outside of BUD.  52-12, Rogers Dep. at 112:14-114:4.

If there were a genuine dispute as to whether Defendants did not terminate similarly situated white employees in the 2021 Reorganization, that might have been grounds to deny summary judgment.  *C.f. Vaughan v. Boeing Co.*, 229 F. Supp. 3d 339, 349 (E.D. Pa. 2017) (finding no evidence of pretext where white employees were not suspended or fired but black and Hispanic employees were where the employees were not similarly situated in terms of disciplinary record).  However, Plaintiff points to no record evidence suggesting that this could be the case[19]

---

[19] Plaintiff incorrectly claims that he filed a motion to compel production of the "number and identity of African American/Black employees in Plaintiff's division . . . who held the position of Grade Level "M."  Pl. Facts ¶ 71 (citing D.E. 41).  In fact, Plaintiff wrote an informal letter to Magistrate Judge Wettre on the eve of the close of discovery bringing his discovery dispute to the Court's attention and presenting argument.  D.E. 41.  Plaintiff never filed a motion to compel. Discovery is now closed and Plaintiff did not file a motion to reopen discovery.  Despite taking depositions from several witnesses with knowledge of the 2021 Reorganization, Plaintiff does not

and there is no genuine dispute that Lynn was one of many employees terminated in the 2021 Reorganization. "An inference of pretext based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat . . . summary judgment." *Steele*, 725 F. App'x at 179 (cleaned up). Therefore, it is of no moment that Lynn was not considered for termination prior to August 31, 2021 and that the 2021 Reorganization was large.

Lynn also argues that a factfinder could infer that Lynn was not terminated as part of the 2021 Reorganization by reference to the following facts: (1) had Lynn not been terminated, it is unclear whether he would have continued to report to Rogers, (2) Lynn was offered a severance agreement that contained a general release of claims, and (3) Maresca, a white individual, took over Lynn's job duties (though the scope of Maresca's duties remains in dispute). Opp'n at 18. However, speculation about Lynn's future reporting structure is insufficient to create a dispute of material fact to defeat summary judgment. *See Steele*, 725 F. App'x at 179. Additionally, the fact that a severance agreement with general claim release terms was presented to Lynn is not evidence of pretext. *See* D.E. 51-14, Mason Dep. at 170:24-171:20. Any such inferences would be impermissible speculation. *See Steele*, 725 F. App'x at 179. Further, although it may be sufficient for purposes of Lynn's *prima facie* burden that there is a dispute as to whether Maresca took over Lynn's job duties, this alone does not provide evidence that a factfinder could use to find that the 2021 Reorganization was not a legitimate reason for terminating Lynn because Lynn has not shown that Maresca was similarly situated in terms of their disciplinary records. *See Harvey*, 838 F. Supp. 2d at 252. No other factor in the *Fuentes* analysis is implicated by Maresca potentially replacing Lynn.

---

point to any record evidence that similarly situated employees not part of the protected class were not terminated in the 2021 Reorganization.

Lynn argues that Rogers' testimony that Lynn was terminated due to the 2021 Reorganization should not be believed. Opp'n at 18-19. *First,* Lynn challenges the credibility of Rogers' testimony that she considered terminating Chilluvudi, Silver, and Robert Todesco because Rogers did not supervise Silver and thus did not have the authority to terminate his employment. *Id.* at 18. Rogers testified that Silver did not report to her. D.E. 52-12, Rogers Dep. at 78:20-23. However, Beadon testified that Silver had a dual reporting line to him and Rogers and that a decision to terminate Silver would have also required his approval. D.E. 52-18, Beadon Dep. at 90:5-19. Regardless, such a minor confusion between Rogers and Beadon regarding whether Rogers *alone* had the authority to terminate one of the four candidates considered is not sufficient to rise to the level of inconsistency required to show an inference of pretext under *Fuentes*. *See Steele*, 725 F. App'x at 179. The inconsistency does not directly relate to whether the 2021 Reorganization was the reason Lynn was terminated and certainly does not show that Rogers or Beadon are liars or completely unreliable. *See id.* at 180.

*Second*, Rogers testified that there was an overlap in roles and that she needed to eliminate a position, D.E. 52-12, Rogers Dep. at 73:5-10, but Lynn argues that Rogers conceded that there was no overlap, Opp'n at 19. The problem with Lynn's argument is that he does not accurately summarize Rogers' testimony. Rogers testified that, prior to the 2021 Reorganization, each of the four senior program managers, including Silver, "had their own book of . . . work" but that, *after* the 2021 Reorganization, there would be some overlap between Silver and Lynn's roles and that there would be "efficiency" in eliminating one of those roles. *Id.* at 82:9-84:18. This is not "shift[ing]" testimony as Lynn attempts to characterize it in his Opposition. Opp'n at 19. Furthermore, the fact there is an inconsistency between Rogers' testimony that Silver's job duties changed following Lynn's termination, Pl. Supp. Facts ¶ 92, and Silver's testimony that his role

stayed the same, *id.* ¶ 93, does not cast doubt on Roger's testimony that there was *some* overlap between Lynn's and Silver's roles.  Indeed, Rogers explained that Silver's role changed to take on some of Lynn's responsibilities that did not overlap.  D.E. 52-12, Rogers Dep. at 93:4-13.  If Rogers was incorrect and Silver's role did not change, that still does not mean there was no overlap—any overlap would merely remain the same. Therefore, this inconsistency does not rise to the level required to create an inference of pretext under *Fuentes*.

*Third,* Lynn argues that Rogers' testimony should be disbelieved because "there is not a single document" surrounding Rogers' decision to terminate Lynn.  Opp'n at 19.  Again, Lynn mischaracterizes the record.  It is true that when there is a complete lack of documentation concerning a plaintiff's termination and where the Court "only has before it dueling narratives," there may be a dispute of material fact as to pretext.  *Johnson v. Verizon Servs. Corp.*, No. 16-1023, 2017 WL 1397240, at *4 (E.D. Pa. Apr. 18, 2017).  However, Lynn's assertion that there "is not a *single* document," Opp'n at 19 (emphasis in original), is not accurate—there was documentation generated that supports Rogers' decisions to terminate Lynn for the reasons proffered by Defendants.  *See, e.g.*, Mid-Year Review; PIP; D.E. 52-19; D.E. 51-5, P-13 at -2686. Lack of *additional* documentation under these circumstances is not a basis to infer pretext.

*Finally*, Lynn argues Rogers testimony that she decided to terminate Lynn for performance reasons should be disbelieved because the Older Workers Benefit Protection Act notice ("OWBPA") provided to Lynn did not include performance as a selection criteria.  Opp'n at 19. Again, Lynn's characterization of the evidence is inaccurate.  Rogers testified that she decided to terminate someone as part of the 2021 Reorganization for efficiency purposes  and that she chose Lynn after considering employees' capabilities, outcomes, and performance.  Pl. Supp. Facts ¶ 79; Defs. Resp. Facts ¶ 79 (citing D.E.s 51-8, 52-12, Rogers Dep. at 45:14-46:3, 397:6-398:9, 435:9-

444:15); Defs. Facts ¶ 129 (citing D.E. 51-8, Rogers Dep. at 94:15-97:12).  Lynn also *admits* that the OWBPA stated that employees were selected for termination, in part, based on "an assessment of the employee's position, functions and skillsets."  Pl. Facts ¶ 129.  The Court does not see any meaningful inconsistency here.  In short, Lynn points to no material dispute, founded in record evidence, that a rational factfinder could use to find that the 2021 Reorganization was merely a pretextual reason for terminating Lynn because of his race.

> b.    *Performance Issues*

Lynn next argues that evidence exists that could establish that Lynn was not terminated as a result of his poor job performance.  Opp'n at 20-21.  Lynn suggests that because he received an adequate performance review in early 2021, when he was still a Portfolio Lead, and because Rogers did not solicit feedback from his manager for his previous role, he was not a poor performer.  *Id.* at 20-21.  However, Lynn does not explain how a review from his prior role indicates anything about his performance in his later role of Program Manager—the role he was terminated from.  The Court sees no connection.

Lynn next suggests that Rogers' complaints regarding his poor performance should be disbelieved because they were made shortly after he began as a Program Manager.  *Id.* at 20-21. However, it is undisputed that in mid-May, Rogers began hearing from individuals working with Lynn that he was not engaged, did not understand the details of his role and assigned programs and projects, and was not satisfactorily acting as Program Manager.  Defs. Facts ¶¶ 77-78. Additionally, on May 25, 2021, Beadon wrote that although Lynn "joined Laura Rodgers team . . . just a few weeks ago," he "is struggling to fit in and adapt, doesn't seem to work well with ambiguity, can[']t get into the game unless he has all the details clearly laid out for him[,] [] seems over sensitive to management hierarchy (resistance to working with Jeff as he is a consultant and

not an FTE)," and that Beadon had "yet to see any productivity." D.E. 51-5, P-13 at -2686. Therefore, the mere fact that Rogers' claims of poor performance came early on does not support an inference that Lynn was actually performing well.

Lynn also suggests that the fact that the PIP Rogers issued to Lynn was the only PIP she had ever issued creates an inference that she was lying about Lynn's performance issues. Opp'n at 21. The Court does not see how the fact that Rogers never needed to put an employee on a PIP before casts doubt on whether a PIP was necessary for Lynn in his specific circumstances.

Lynn further argues that the performance rationale should be disbelieved because although Defendants alleged that "[i]nternal clients were bombarding [Rogers] with cranky voicemails and emails inquiring about why her Project Manager refused to do his job," Defendants did not produce any such voicemails or emails in discovery. Opp'n at 21. But even if such voicemails and emails do not exist, the Court finds it undisputed that internal colleagues genuinely believed that Lynn suffered performance issues. *See, e.g.*, Defs. Facts ¶¶ 77-78; D.E. 51-5, P-13 at -2686.[20] Therefore, the existence of voicemails or emails is immaterial in the face of undisputed testimony and documentary evidence memorializing the concerns. *See, e.g.*, Mid-Year Review; PIP.

Lynn finally argues that his own testimony regarding how well he performed his job and why the performance criticisms were unjust is sufficient to show an inference of pretext. Opp'n at 21. In support of his argument Lynn cites the following excerpts from his deposition, Lynn Dep. at 324:23-325:13, 335:9-337:9, 338:21-339:17, 346:8-347:14, 347:23-354:5. Opp'n at 21. However, a careful read of Lynn's testimony reveals a dispute over the extent of his performance issues, but no bona fide dispute over the fact that he did indeed have *some* performance issues that

---

[20] As discussed in the next paragraph, Lynn's testimony disputing certain performance criticisms only disputes *some* performance issues cited by Defendants as the basis for Lynn's termination.

could form the basis of a termination decision, or that race discrimination was the likely reason for Lynn's termination. The Court's analysis of Lynn's testimony is guided by the rule that conclusory, self-serving affidavits and testimony are insufficient to withstand a motion for summary judgment. *Blair*, 283 F.3d at 608; *Irving*, 439 F. App'x at 127. Moreover, any dispute must be "material" and "genuine." Fed. R. Civ. P. 56(a); *Kaucher*, 455 F.3d at 423.

The first portion of testimony cited by Lynn criticizes his Mid-Year Review by stating that "it's full of opinions," and "lies by omission," and that the allegations are "not backed up by facts." Lynn Dep. at 324:23-325:13. These are the types of conclusory statements that cannot defeat a motion for summary judgment. *See Irving*, 439 F. App'x at 127.

The next portion of testimony does dispute *one specific instance* cited by Rogers as a performance issue. According to Lynn, Rogers claimed that he inappropriately escalated a disagreement with a colleague, but, in fact, it was someone else who escalated the disagreement she had with Lynn—Lynn then implied that this other employee lied about him assigning junior-level work to a peer. Lynn Dep. at 335:15-336:25, 339:1-17.[21] However, this dispute about one small aspect of the performance issues identified by Defendants cannot form the basis of a material dispute of fact as to pretext since, even if Lynn is correct, it does not rebut the various other performance issues outlined by Rogers and in the Mid-Year Review and PIP—for example, that Lynn "has been tentative in owning his full portfolio," and that "some of the details are too technical for him to track." Mid-Year Review at -681.

The next portion of testimony cited by Lynn is him disagreeing that his Mid-Year Review includes specific examples of performance issues and states conclusively that the review is false

---

[21] Lynn also cites to pages 337 and 338 of his deposition but neither party provides the Court with those pages of Lynn's deposition so the Court is unable to consider them.

and not backed up by facts. *Id.* at 346:8-347:14, 352:23-354:5. Lynn also takes issue with the statement that his peers "expressed concerns on the rational thinking on some of his work" because the Mid-Year Review does not list those people and does not give facts backing that up and that Lynn had "no idea what [Rogers] is talking about there." *Id.* at 352:5-14. The Mid-Year Review is a document that speaks for itself and the performance issues outlined in it are detailed above. Lynn's characterization of the specificity of the Mid-Year Review is plainly insufficient to create a dispute of material fact to defeat summary judgment. Furthermore, his claims that the Mid-Year Review is false and not supported are conclusory. *See Irving*, 439 F. App'x at 127.

The final portion of testimony cited by Lynn similarly does not create a dispute as to an inference of pretext. Lynn testified that his Mid-Year Review criticized him for staying silent in a meeting instead of providing feedback but that this criticisms was unfair because Lynn had already told Rogers about the disagreement and, in his view, it was appropriate to say nothing. Lynn Dep. at 347:23-352:3. However, Lynn does not dispute that Rogers still felt that he should have raised this at the meeting and he does not dispute that he failed to do so. Even if this Court were to disagree that Lynn should have been expected to speak on this at the meeting, it is not this Court's role to second guess Lynn's superiors on this point and act as a human resources department. *See Hennessey*, 833 F. App'x at 966.

Therefore, Lynn fails to satisfy his burden to show an inference of pretext that a rational factfinder could rely upon under the *Fuentes* test and Defendants are entitled to summary judgment on the theory that Lynn was racially discriminated against when he was terminated from his role as Program Manager.

       3.      *Lynn fails to state a prima facie case for discrimination based on an alleged "demotion" from his first role as Portfolio Lead to his next role as Program Manager*

Defendants argue that Lynn did not suffer an adverse employment action because he was not "demoted" when he was hired as Program Manager. Mot. at 21-23. Lynn argues he was forced to leave his Portfolio Lead position and take a "lesser" Program Manager role. Opp'n at 24-27. The Court agrees with Defendants and finds that Lynn fails to state a prima facie case of employment discrimination because there is no genuine dispute that Lynn voluntarily accepted the Program Manager role.

Generally, voluntary action by an employee cannot be considered an adverse employment action taken by an employer. *See Larochelle v. Wilmac Corp.*, 769 F. App'x 57, 60-61 (3d Cir. 2019). However, the Third Circuit has recognized constructive discharge as an adverse employment action. *See id.*[22] Lynn does not allege constructive termination—rather, he alleges that he was constructively demoted because his decision to accept the Program Manager position was not truly voluntary and he was instead "forced" to find a Program Manager position in order to remain employed. Opp'n at 24. The Third Circuit "has not explicitly held that constructive demotion is a viable adverse employment action, however, it has intimated that constructive demotion could be cognizable in the employment discrimination context." *Conklin v. McDonough*, No. 20-2010, 2024 WL 1721315, at *10 (W.D. Pa. Apr. 22, 2024) (citing *Clark v. Twp. of Falls*, 890 F.2d 611, 618-19 (3d Cir. 1989)) (cleaned up). The Court agrees with other district courts in the Third Circuit that have reasoned that a "constructive demotion should not be any more tolerable than a constructive discharge . . . ." *Id.* The analysis for whether there has

---

[22] The test for constructive termination is whether "working conditions bec[ame] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).

been a constructive demotion turns on whether the demotion was "truly voluntary." *Id.* (cleaned up).

The parties do not dispute that Lynn applied for his new role as Program Manager. According to Lynn, Shawe told him that he would not be able to continue as a Portfolio Lead and needed to transition into a Program Manager position. Pl. Facts ¶ 29 (citing 52-27 ("Lynn Decl.") ¶ 4); Pl. Supp. Facts. ¶ 16 (citing Lynn Dep. at 177:17-22; D.E. 52-10, Shawe Dep. at 166:20-167:9). Lynn further claims that Shawe told him he had three to six months to find a new role as Program Manager. Lynn Decl. ¶ 4. Shawe's testimony does not dispute that he told Lynn he had three to six months to find a new role but claims that this conversation happened *after* Lynn had already voluntarily accepted his new role as Program Manager and had completed his transition. D.E. 52-10, Shawe Dep. at 167:11-168:13. Shawe explained that, after Lynn transitioned into his new role as Program Manager, Lynn asked what would happen if he did not want to stay in that position and Shawe responded that Lynn could return but only for three to six months. *Id.* Lynn's only evidence that might be construed as disputing the timing of this conversation is his own conclusory affidavit that claims it was his "underst[anding]" that Shawe's comments meant he would be terminated if he did not find a Program Manager role within that time. Lynn Decl. ¶ 4. However, this conclusory, vague, and self-serving statement alone cannot defeat summary judgment. *See Irving*, 439 F. App'x at 127.

Lynn offers no evidence to contradict Shawe's testimony that his conversation with Lynn (that Lynn alleges supports the constructive demotion claim) happened *after* Lynn had already applied for, accepted, and transitioned into his new Program Manager role. Therefore, there is no genuine dispute that Lynn voluntarily accepted the Program Manager role and, therefore, Lynn

28

cannot establish a *prima facie* case for race discrimination based on the alleged "demotion" to Program Manager.[23]  Defendants are entitled to summary judgment on this theory.

> 4.    *Lynn fails to state a prima facie case for discrimination based on Defendants' alleged failure-to-hire Lynn into the Data Taxonomy Position*[24]

Defendants argue that there is no evidence of adverse employment action when Defendants allegedly failed to hire Lynn into the Data Taxonomy Position because the position never existed, was never created and, therefore, there can be no discrimination claim based on the failure to hire Lynn to a non-existent role.  Mot. at 23-26.  The Court agrees.

A plaintiff cannot establish a *prima facie* case for failure-to-hire discrimination where the position at issue was anticipated to be created but was "never actually created, and consequently," the plaintiff "never applied for and was not rejected for this hypothetical role."  *Hunter v. Trustees of University of Pa.*, No. 20-2334, 2021 WL 1424710, at *6 (E.D. Pa. Apr. 15, 2021) (citing *Young v. Temple Univ. Hosp.*, 359 F. App'x 304, 310 (3d Cir. 2009)).

There is no dispute that Defendants considered creating the Data Taxonomy Position and considered Lynn for the job.  Pl. Supp. Facts ¶¶ 47-53.  However, there is also no genuine dispute that the Data Taxonomy Position was never created.  Defs. Facts ¶ 94.[25]  Instead, Defendants created entirely different L-level positions (a lower level than the M-level status held by Lynn at

---

[23] Because the Court finds no adverse employment action due to the voluntariness of Lynn's transition, it need not consider whether there is a dispute that the Program Manager role was inferior in any material way to Lynn's previous role as Portfolio Lead.

[24] Lynn concedes that he is not bringing a claim based on the failure to hire him into a the Group Manager, Data Management role to which he applied after receiving notice of his termination. Opp'n at 4 n.2.  Therefore, the Court need not consider Defendants' arguments on this theory that is admittedly not being pursued.  Mot. at 35-36.

[25] Because there is no genuine dispute that the Data Taxonomy Position was never created, Lynn's attempt to distinguish Defendants' authority on the basis that those cases involved positions that did not exist falls flat.  Opp'n at 31 n.12.

the time)—positions to which Lynn never applied. *Id.*; Pl. Facts ¶ 94.[26]  Just because Defendants considered potential candidates for the hypothetical role, *see, e.g.*, D.E. 51-5, P-13 at -2686 (considering Lynn for the role prior to it being created), does not make the role any less hypothetical.  As there is no dispute that the Data Taxonomy Position was never actually created, there is no genuine dispute that there was no adverse employment action taken by a supposed failure-to-hire Lynn into that nonexistent role.  Defendants are entitled to summary judgment on this theory.

> 5.    *There is a dispute of material fact as to whether Lynn establishes a prima facie case for discrimination based on the performance feedback he received, but Lynn does not satisfy his burden to show a dispute of material fact as to whether there is an inference of pretext after Defendants' proffered a legitimate reason for that feedback*

Lynn argues that the negative performance feedback he was subjected to itself constitutes race discrimination.  Opp'n at 22-24.  As to the *prima facie* case, Defendants appear to argue only that Lynn's performance criticisms did not occur under circumstances that could give rise to an inference of unlawful discrimination.  Mot. at 26-31.  Because Defendants do not dispute that the negative performance criticisms, at least in part, resulted in Lynn's termination, Defs. Facts ¶ 129, and that Lynn puts forward evidence that he was replaced by a white individual, Maresca, Pl. Supp. Facts. ¶¶ 97-98, he has demonstrated a dispute of fact as to an inference of discrimination.  *See May*, 434 F. Supp. 3d at 296; *supra*, Section IV(A)(1).

Lynn argues that a factfinder could conclude that his performance feedback was discriminatory for the same reasons it could find a dispute as to pretext in his termination theory of discrimination.  Opp'n at 23.  The Court has already found that there is no dispute of fact as to whether Lynn's performance feedback was merely pretextual.  *See supra*, Section IV(A)(2)(b).

---

[26] Lynn's failure-to-hire claim does not encompass an alleged failure-to-hire him into these different L-level positions to which he did not apply.  Opp'n at 27-31.

Therefore, for the same reasons applicable to Lynn's termination theory, the Court finds that Lynn has not identified a material dispute of fact that a rational factfinder could use to find that Lynn's performance feedback was merely pretext for a racially discriminatory motive. Defendants are entitled to summary judgment on this theory.

## B.    Retaliation under Title VII, Section 1981, and NJLAD

Counts I, II, and III also allege unlawful retaliation under Title VII, Section 1981, and the NJLAD, respectively. Compl. ¶¶ 93-111. The same legal framework, including the *McDonnell Douglas* burden shifting framework, governs claims for retaliation under all three statutes. *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006); *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (applying *Moore* to Title VII and NJLAD retaliation claims); *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) (applying *Moore* to Section 1981 retaliation claims).

> 1.    *There is a dispute of material fact as to whether Lynn satisfies his prima facie burden for his retaliation claim based on his termination from his role as Program Manager*

"To state a *prima facie* case of retaliation, a plaintiff must show that (1) []he engaged in a protected activity, (2) []he suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (citing *Moore*, 461 F.3d at 340-41). Defendants do not argue that Lynn's termination was not an adverse employment action. Therefore, the Court only addresses prongs one and three.

> a.    *A rational factfinder could find that Lynn engaged in protected activity*

As to prong one, Defendants argue that Lynn has not shown evidence that he engaged in a protected activity. Mot. at 33-35. The Court disagrees.

31

Protected activity occurs when an employee opposes, or participates in a proceeding against, an employer's unlawful activity so long as the employee holds an objectively reasonable belief, in good faith, that the activity they oppose is unlawful. *See Moore*, 461 F.3d at 341. "Thus, while all complaints or protests must be more than just 'general complaints of unfair treatment,' *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995), protection is not lost because an employee might be or is mistaken on the merits of his or her claim." *Webb v. Merck & Co.*, 450 F. Supp. 2d 582, 600 (E.D. Pa. 2006) (citing *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006)).

Lynn points to three instances of alleged protected activity: (1) the April 27, 2021 PowerPoint Presentation footnote; (2) his June 17, 2021 EEOC Complaint; and (3) his August 19 Email. Opp'n at 10. Defendants argue that Lynn's complaints were not made in good faith. Mot. at 29 n.9, 36-38.

As for the PowerPoint Presentation footnote, the parties dispute the content of Blank and Rogers' testimony; but this is somewhat beside the point. Blank testified that although she did not believe Lynn violated any official reporting policies by making his complaint the way he did, it was "inconsistent with the spirit" of such policies. D.E. 51-7, Blank Dep. at 223:19-224:22. Blank further testified that she thought that Lynn "believed what he said" but the manner in which he raised the complaint was "questionable." D.E. 52-12, Blank Dep. at 233:16-234:7. Rogers testified that she did not conclude Lynn was making a false complaint, but that she did not think the manner in which he raised the complaint was the right way to do so. D.E. 51-8, Rogers Dep. at 224:2-15. Rogers did not know if Lynn made this complaint in good faith. D.E. 51-8, Rogers Dep. at 226:18-21. Apart from being unconclusive, what Rogers and Blank thought about Lynn's subjective beliefs does not address the objective reasonableness of Lynn's beliefs.

32

It is clear that Lynn makes more than "general complaints of unfair treatment" in the PowerPoint Presentation. *Barber*, 68 F.3d at 702. He provides specific examples of what he allegedly believed constituted racial discrimination and a racially hostile workplace. For example, Lynn wrote that Shawe told him that he does "not believe in black lives matter" and that although he was given a satisfactory performance rating in January, he was "demoted" shortly thereafter. PowerPoint Presentation at -190. Defendants make arguments as to why Lynn was mistaken or why these examples are not actionable under relevant law. Mot. at 36-38. But whether Lynn's complaints are accurate or whether he is correct that these examples constitute unlawful activity is not decisive. What matters is whether Lynn believed he was being discriminated against and whether a reasonable person in Lynn's shoes could have also believed that. *See Moore*, 461 F.3d at 341. Even though a factfinder could ultimately find that Lynn was mistaken, or perhaps even manufacturing erroneous complaints, the record does not conclusively establish that Lynn was lying about his observations and that a reasonable person in his position could not come away with the same belief that they were being discriminated against. Therefore, factual disputes exist that bear on whether the PowerPoint Presentation footnote constitutes protected activity.

Similarly, a factfinder could find that the EEOC Complaint constitutes protected activity. The EEOC Complaint lists specific examples of what Lynn allegedly believed constitutes race discrimination, retaliation, and a hostile work environment. Defendants argue that Lynn emailing a copy of the EEOC Complaint to Rogers and others five days after filing it clearly establishes that the EEOC Complaint was an "obvious attempt to manufacture a future retaliation claim." Mot. at 37. The Court disagrees. There is no authority the Court is aware of that supports a finding that sending a copy of an EEOC charge to employers establishes that it was made in bad faith. Defendants also argue that Lynn knew he suffered from performance issues. *Id.* However, as

discussed above in connection with the PowerPoint Presentation, the record is not conclusive that Lynn believed he had performance issues. As previously addressed, there is no dispute that Lynn was aware Defendants identified these performance issues and there is no dispute that at least some of the performance issues were legitimate. But Lynn does disagree that other issues Defendants identified as performance issues actually reflected negatively on his performance—in essence disagreeing with his superiors over his own performance. While this is not enough to overcome a pretext analysis, it is sufficient to create a dispute of fact as to whether Lynn was acting in good faith.

The Court is also unable to conclude that the August 19 Email was not protected activity. Defendants argue that the August 19 Email "did not raise anything new" and must therefore be an attempt to manufacture a retaliation claim. *Id.* However, as Lynn points out, the August 19 Email lists a new complaint—that the negative Mid-Year Review and PIP constituted additional forms of discrimination and retaliation for filing the EEOC Complaint. If Lynn and a reasonable employee in his position could have believed that the Mid-Year Review and PIP were unjustified, the Court cannot find the complaint was made in bad faith as a matter of law. As discussed above, Lynn points to specific disagreements he had with some of his performance feedback. This, while not sufficient to show pretext, is sufficient to show a dispute as to good faith.

Defendants further argue, albeit in footnotes, that Lynn was not acting in good faith when he made each of the above three complaints because he was impermissibly attempting to insulate himself from disciplinary action by preemptively making a complaint. Mot. at 29 n.9; Reply at 15 n.17. The Court is not persuaded. "[A]n employee may not insulate [him]self from termination by covering [him]self with the cloak of Title VII's opposition protections after committing non-protected conduct that was the basis for the decision to terminate. If subsequent conduct could

prevent an employer from following up on an earlier decision to terminate, employers would be placed in a judicial straight-jacket not contemplated by Congress." *Curay-Cramer v. Ursuline Acad. Of Wilmington, Del., Inc.*, 450 F.3d 130, 137 (3d Cir. 2006); *see also Proudfoot v. Arnold Logistics, LLC*, 629 F. App'x 303, 308 (3d Cir. 2015) (applying *Curay-Cramer* to uphold summary judgment in favor of employer where employee only began complaining of harassment after he was informed that his misconduct was being investigated).

Here, Defendants did not decide to terminate Lynn until August 31, 2021—after all of the alleged protected activity took place. *See* Pl. Supp. Facts ¶ 79; Defs. Resp. Facts ¶ 79. Furthermore, Lynn's first complaint of unlawful activity, the PowerPoint Presentation, occurred before Lynn was informed that his performance was an issue. *See* PowerPoint Presentation; Defs. Facts ¶¶ 77-78; Pl. Supp. Facts ¶ 36. Under these circumstances, the Court cannot determine, as a matter of law, that Lynn was impermissibly insulating himself from termination by making any of his three complaints. *See Curay-Cramer*, 450 F.3d at 137; *Proudfoot*, 629 F. App'x at 308.

>    b.    *Lynn points to evidence of a causal connection between his EEOC Complaint and the August 19 Email on one hand and Defendants' decision to terminate him on the other hand*

As to prong three, the Court finds that Lynn has put forward evidence of a causal connection sufficient to satisfy his *prima facie* burden on his retaliation claim with respect to his termination. In assessing whether there is a causal connection between the protected activity and adverse employment action, the Court analyzes the "temporal proximity of the protected activity and the adverse employment action, as well as whether or not there is a pattern of antagonism." *Tourtellotte*, 636 F. App'x at 852. Evidence of causation can also be "gleaned from the record as a whole." *Griesbaum v. Aventis Pharm.*, 259 F. App'x 459, 466-67 (3d Cir. 2007).

35

The Third Circuit "has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action," *Drawl v. Borough of West View, Pa.*, 617 F. Supp. 2d 397, 421 (W.D. Pa. 2009)—but it must be a "short period of time," *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005).   However, an approximately three-month separation between the protected activity and the adverse action has been sufficient to establish temporal proximity.   *See id.*   "In order to demonstrate a 'pattern of antagonism,' [a] [p]laintiff must put forth evidence such as a 'constant barrage of written and verbal warnings . . . and disciplinary action[s] . . . soon after plaintiff's initial complaints.'"   *Thomas v. Bronco Oilfield Servs.*, 503 F. Supp. 3d 276, 313 (W.D. Pa. 2020) (quoting *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993)).   The pattern must be "more than a series of disciplinary actions; a plaintiff must 'offer [a] basis for linking the disciplinary actions to [his] [protected activity].'"   *Id.* (quoting *Bartos v. VHM Correctional Servs., Inc.*, 454 F. App'x 74, 79 (3d Cir. 2011)).

Lynn does not show evidence of a causal connection between the PowerPoint Presentation footnote and his termination.   Lynn wrote the footnote on April 27, 2021, Defs. Facts ¶ 54, but was not selected for termination until over four months later on August 31, 2021, Pl. Supp. Facts ¶ 79.   Plaintiff does not cite any authority that supports a finding that a four-month gap between the protected activity and the adverse action is sufficient to constitute evidence of a causal connection and the Court finds that, under the circumstances here, such a length of time is not evidence of a causal causation.

Lynn also does not show evidence that could establish a pattern of antagonism, or a causal inference taken from the record as a whole.   In May 2021, Blank reported to Lynn that Rogers had raised a number of performance issues with her.   Pl. Supp. Facts ¶¶ 42-43.   Also in May 2021, Rogers told Lynn that he was not performing his job duties as she expected.   *Id.* ¶ 36.   The next

month, Rogers met with Lynn and delivered talking points to him where she took issue with the manner in which he raised his complaints in the PowerPoint Presentation and that she considered it a "breach of trust" and a "lapse of judgment" that Lynn took that approach.  D.E. 51-5, P-14-15; D.E. 51-8, Rogers Dep. at 270:7-19.  Lynn received written negative performance reviews in his Mid-Year Review and PIP in August 2021.  Mid-Year Review; PIP.  These are nothing more than a "series of disciplinary actions."  *Thomas*, 503 F. Supp. 3d at 313.  Lynn offers no evidence to link these actions to protected activity, so they cannot constitute evidence of a pattern of antagonism or an inference of causation. *See id.*

Lynn testified that following his EEOC Complaint, Rogers' "contempt for [him] became palpable" and "infectious," such that his colleagues "started to behave in a dismissive way."  Pl. Supp. Facts ¶ 67.  However, this is not sufficient to constitute evidence of a pattern of antagonism. *See Thomas*, 503 F. Supp. 3d at 313.  The same is true for Lynn's simultaneous allegations of "micromanagement," and being ignored, Pl. Supp. Facts ¶¶ 68-69—it is not apparent to the Court how the closeness of interactions with colleagues can support a pattern of antagonism and it finds that a pattern of antagonism is not shown here.  Furthermore, the fact that Lynn's EEOC Complaint "frustrated" Rogers, does not show an inference of causation—although she was frustrated by the EEOC Complaint, she wanted to keep working with Lynn after he filed it.  Pl. Supp. Facts ¶ 61; Defs. Resp. Facts ¶ 61.

However, the temporal proximity between the EEOC Complaint and the August 19 Email on one hand, and Lynn's termination on the other hand, creates an issue of fact as to causation at the *prima facie* stage.  Lynn filed his EEOC Complaint on June 17, 2021.  EEOC Complaint.  Lynn sent the August 19 Email just two days before he was selected for termination on August 31, 2021. August 19 Email; Pl. Supp. Facts ¶ 79.  Because the Third Circuit has found an approximately

37

three-month period of time between the protected activity and adverse action to support an inference of causation, *Fasold*, 409 F.3d at 190, there is a sufficient inference of causation here such that a rational factfinder could determine that Lynn satisfied his *prima facie* burden with respect to the potentially protected activity of filing the EEOC Complaint and sending the August 19 Email.[27]

> 2.    *Lynn points to no evidence of causation that a reasonable factfinder could use to conclude that Defendants' proffered motivations for terminating plaintiff were pretextual*

Like in Lynn's discrimination claim, he does not dispute that Defendants have pointed to non-retaliatory reasons for his termination—the 2021 Reorganization and Lynn's performance issues.  Lynn argues that the 2021 Reorganization and his performance were merely pretextual reasons for his termination and that a factfinder could conclude that his termination was retaliatory.  Opp'n at 16-22.  The Court finds that Lynn has not shown a dispute of material fact that a factfinder could use to find an inference of pretext.

To show pretext in the retaliation context, the plaintiff must show "both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Young v. City of Philadelphia Police Dep't*, 651 F. App'x 90, 95 (3d Cir. 2016).[28]  The "burden for establishing causation at the *prima facie* stage is less onerous" than at the pretext stage.  *Id.* at 97.  "To prove causation at the pretext stage, the plaintiff must show that []he would not have suffered an adverse employment action 'but for' [his] protected activity."  *Id.*

---

[27] As described above, the Court finds no evidence of a causal connection between the PowerPoint Presentation complaint and Lynn's termination.

[28] This test is different from the pretext test applicable to discrimination claims which requires *either* that the employer's articulated reason is false *or* that a discriminatory reason was the motivating or determinative cause of the employer's action.  *See Ortiz* 764 F. App'x, at 259; *Collins v. Kimberly-Clerk Pennsylvania, LLC*, 247 F. Supp. 3d 571, 590 (E.D. Pa. 2017) (citing *Fuentes*, 32 F.3d at 764).

at 96 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).  "Thus, for a plaintiff to prevail at the pretext stage, he . . . must produce evidence showing that the employer's reason for its action was false *and* retaliation for engaging in the protected activity was the real reason, or 'but-for' cause, for its actions."  *Id.* at 97 (emphasis added).

At the *prima facie* stage, the only inference of causation that is in dispute is based purely on the temporal proximity between the EEOC Complaint and the August 19 Email on one hand, and Lynn's termination on the other hand.  *Supra*, Section IV(B)(1)(b).  Because the "but-for" causation standard applies at the pretext stage, courts generally do not find that temporal proximity alone is sufficient to raise a dispute of material fact as to causation at the pretext stage.  *See, e.g.*, *Young*, 651 F. App'x at 98-99 (finding that the plaintiff showed causation at the *prima facie* stage due to close temporal proximity but upholding summary judgment in favor of the employer at the pretext stage without considering temporal proximity).  However, the Third Circuit has recognized that "temporal proximity may be sufficient to show pretext '[i]n certain narrow circumstances' based on the particular facts and stage of a case."  *Proudfoot*, 629 F. App'x at 308.

Just because causation is met for purposes of the *prima facie* step does not mean it will be met in the pretext stage.  In *Proudfoot*, there was no dispute that the plaintiff made out a *prima facie* case but, when analyzing temporal proximity in the pretext stage, the court found that even a one-day lapse between the protected activity and termination was not sufficient to escape summary judgment in favor of the employer due to the surrounding circumstances.  In addition to the disallowed insulation from termination discussed in *Curay-Cramer*, the *Proudfoot* court found that the sequence of events was not evidence of causation at the pretext stage.  *See Proudfoot*, 629 F. App'x at 308-09.

In *Young*, the court found that temporal proximity that was sufficient at the *prima facie* stage failed to defeat summary judgment at the pretext stage because there was no genuine dispute of material fact as to at least *some* of the underlying conduct that was the proffered reason for the termination and because the plaintiff did not show evidence that she was treated differently from similarly situated employees. *See Young*, 651 F. App'x at 99. This case is similar to *Young*.

Here, like in *Young*, the temporal proximity between the protected activity and Lynn's termination does not create a dispute of material fact sufficient to escape summary judgment at the pretext stage despite being sufficient at the *prima facie* stage. Also like in *Young*, and as discussed *supra*, Section IV(A)(2), there is no genuine dispute that Defendants had legitimate concerns with at least *some* of Lynn's performance and that he was selected to be terminated as part of the 2021 Reorganization. That Lynn disputed certain specified instances of criticism does not create a dispute as to the whole of the performance issues Defendants have proffered. *Supra*, Section IV(A)(2)(b). Additionally, like in *Young*, the Court also found that Lynn does not point to evidence that he was treated differently than similarly situated employees. *Supra*, Section IV(A)(2)(a). The same reasoning applies to Lynn's retaliation claim. Under these circumstances, the temporal proximity between the protected activity and Lynn's termination does not create a dispute of material fact as to causation in the pretext stage of the analysis. Therefore, Defendants are entitled to summary judgment on Lynn's retaliation claim with respect to his termination.

### 3. Lynn fails to state a prima facie case for retaliation based on a supposed "demotion" from his first role as Portfolio Lead to his next role as Program Manager

The Court agrees with Defendants that they are entitled to summary judgment on Lynn's retaliation claim to the extent it is based on Lynn's alleged "demotion" to Program Manager. The Court previously found that Lynn's alleged "demotion" did not constitute an adverse employment action because there was no genuine dispute of material fact that his decision to accept the Program

Manager role was voluntary. *Supra*, Section IV(A)(3). Therefore, Lynn fails to make a *prima facie* case for retaliation based on the theory that he was "demoted" to Program Manager and Defendants are entitled to summary judgment on this theory.

> 4. *Lynn fails to state a prima facie case for retaliation based on Defendants' alleged failure to hire Lynn to the Data Taxonomy Position*

The Court agrees with Defendants that they are entitled to summary judgment on Lynn's retaliation claim to the extent it is based on an alleged failure to hire Lynn into the Data Taxonomy Position. The Court previously found that there was no dispute that the Data Taxonomy Position was never actually created and, therefore, that there was no adverse employment action by failing to hire Lynn into that nonexistent role. *Supra*, Section IV(A)(4). Therefore, Lynn fails to establish a *prima facie* case for retaliation based on the theory that Defendants failed to hire him into the Data Taxonomy Position and Defendants are entitled to summary judgment on this theory.

> 5. *There is a dispute of material fact as to whether Lynn establishes a prima facie case that Defendants retaliated against him for filing the EEOC Complaint by issuing him negative performance reviews*

Lynn argues that the negative performance feedback he was subjected to—specifically his Mid-Year Review and PIP issued on August 17, 2021—constitutes retaliatory action. Opp'n at 22-24. The Court finds that a rational factfinder could find that Lynn satisfied his *prima facie* burden on this theory.

As to the *prima facie* case for retaliation, the Court has already determined that a rational factfinder could find that two complaints—the PowerPoint Presentation footnote and the EEOC Complaint—constitute protected activity. *Supra*, Section IV(B)(1)(A). Defendants do not argue that the performance feedback does not constitute adverse employment action. However,

Defendants argue that there is no evidence supporting an inference of causation between the protected activity and performance feedback. Mot. at 28-31.[29]

The Court has already found that a two-and-a-half-month period between the EEOC Complaint and Lynn's termination could be a sufficient proximity to satisfy the causation element of Lynn's *prima facie* case of retaliation. *Supra*, Section IV(B)(1)(b). Here, the temporal proximity between the EEOC Complaint and performance feedback is exactly two-months. EEOC Complaint (filed June 17, 2021); Mid-Year Review; PIP (sent to Lynn on August 17, 2021). Therefore, this temporal proximity is within the range that the Third Circuit has found sufficient for *prima facie* causation purposes. *See Fasold*, 409 F.3d at 190. *Shaner*, on the other hand, involved a case where the Court found that the temporal proximity between the protected activity and adverse action was too attenuated to support an inference of causation. Therefore, like in his retaliatory termination theory, there is a dispute as to causation at the *prima facie* stage of Lynn's retaliatory performance feedback theory.[30] As in Lynn's termination retaliation theory, the Court is unpersuaded that there is other evidence supporting an inference of causation. *Supra*, Section IV(B)(1)(b). Therefore, a reasonable factfinder could conclude that Lynn satisfies his *prima facie*

---

[29] Defendants argue that holding an employee to performance standards is not retaliation. *Id.* at 28-29 (citing *Shaner v. Syntheses (USA)*, 204 F.3d 494, 505 (3d Cir. 2000)). Defendants cite dicta in *Shaner* generally warning that it is "important that an employer not be dissuaded from making what [it] believes is an appropriate evaluation by reason of fear that the evaluated employee will charge that the evaluation was retaliatory." *Shaner*, 204 F.3d at 505. *Shaner* does not stand for the proposition that some heightened causation standard applies to retaliation claims based on performance reviews. *Shaner* states the uncontroversial—that in cases where the circumstances cannot support an inference of causation, court "should not hesitate to say so." *Id.*

[30] The same dispute as to *prima facie* causation based on temporal proximity does not exist when considering the PowerPoint Presentation as the protected activity. The PowerPoint Presentation footnote was generated on April 27, 2021 and the Mid-Year Review and PIP were sent to Lynn on August 17, 2021. The Court is unaware of any authority supporting an inference of causation based on an approximately four-month period of time between the protected activity and adverse action.

case of retaliation by issuing negative performance feedback in response to his EEOC Complaint but not in response to his PowerPoint presentation footnote.

> 6.    *Lynn fails to show evidence of pretext to rebut Defendants' proffered legitimate reason for the negative Mid-Year Review and PIP*

The Court agrees with Defendants that they are entitled to summary judgment at the pretext stage on Lynn's retaliation claim based on his negative performance feedback.  The Court previously found that there is no bona fide dispute that at least some of the performance feedback Lynn received was legitimate.  *Supra*, Section (IV)(A)(2)(b).  Therefore, for the same reasons that apply to Lynn's retaliation claim based on his termination, *supra*, Section IV(B)(2), Defendants are entitled to summary judgment on Lynn's retaliation claim based on his performance feedback.

**C.    Lynn Fails to Establish a Prima Facie Case of Racially Hostile Work Environment under Title VII, Section 1981, and NJLAD**

Counts I, II, and III allege race-based harassment/hostile work environment under Title VII, Section 1981, and the NJLAD, respectively.  Compl. ¶¶ 93-111.  The same legal framework governs claims for race discrimination under all three statutes.  *See Castleberry*, 863 F.3d at 263 ("[Section 1981] claims are subject to the same analysis as discrimination claims under Title VII."); *Ali*, 957 F.3d at 180 ("Claims brought under NJLAD and § 1981 are analyzed under the same framework.").

Lynn argues both that he was subjected to discriminatory hostile work environment and retaliatory hostile work environment.  Opp'n at 31-36.  To establish a discriminatory hostile work environment claim, a plaintiff must show the "existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee."  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (cleaned up).  "Specifically, a plaintiff must show: "(1) that he . . . suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the

plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in

that position; and (5) the existence of respondeat superior liability."[31] *Id.* (Title VII); *see Ocasio*

*v. Lehigh Valley Family Health Center*, 92 F. App'x 876, 879 (3d Cir. 2004) (explaining that the

same standards that apply to a Title VII claim apply to a Section 1981 claim); *Thange v. Oxford*

*Global Resources, LLC*, No. 19-5979, 2022 WL 2046938, at *6 (D.N.J. June 7, 2022) (explaining

that the same principles that apply to a Title VII claim also apply to a NJLAD claim for racially

hostile work environment)[32].  The same "[discriminatory] hostile work environment framework"

discussed above "applies equally to claims of retaliatory hostile work environment."  *Komis v.*

*Sec'y of United States Dep't of Labor*, 918 F.3d 289, 293 (3d Cir. 2019), *abrogated on other*

*grounds by Muldrow v. City of St. Lewis*, 601 U.S. 346 (2024).[33]

    "The first four elements establish a hostile work environment, and the fifth element

determines employer liability."  *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir.

2013).  Not all workplace conduct that may be described as harassment rises to the level of an

actionable hostile work environment. *Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25 (3d Cir.

2006).  "A court should consider all the circumstances in determining whether an environment is

---

[31] Lynn argues that "severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact."  Opp'n at 35 (quoting *Rorrer v. Cleveland Steel Container*, 712 F. Supp. 2d 422, 429 (E.D. Pa. 2010)).  While this may be true in some cases and courts should be careful not wade into impermissible fact finding, where a plaintiff does not show facts in dispute that a reasonable fact finder could find severe or pervasive, then a defendant is entitled to summary judgment on a plaintiff's hostile work environment claim.  *See, e.g.*, *Tourtellotte*, 2013 WL 1628606, at *6 (granting summary judgment to defendant on this basis).

[32] *See also Nuness v. Simon and Schuster, Inc.*, 325 F. Supp. 3d 535, 545 (D.N.J. 2018) (listing functionally the same elements for an NJLAD claim).

[33] Lynn argues that Defendants waived their argument on a theory of retaliatory hostile work environment because they did not specifically address it in their motion.  Opp'n at 32.  The Court disagrees.  Defendants moved for summary judgment on Lynn's hostile work environment claim.  Mot.  The Complaint does not specify which sub-theories Lynn was pursuing.

hostile or abusive, including the 'frequency of the discriminatory conduct, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Tourtellotte*, 2013 WL 1628606, at *5 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)).[34]

Here, even assuming for summary judgment purposes that the actions identified by Lynn occurred as he alleges, a reasonable fact finder could not find that such acts, individually or together, were sufficiently severe or pervasive or materially adverse to prevail in his hostile work environment claim. None of the activity alleged by Lynn was "physically threatening" or "humiliating" and is unquestionably not so extreme as to "amount to a change in the terms and conditions of employment." *Id.* at *6 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see Fennell*, 628 F. Supp. 3d at 588 (finding that similar actions constituted nothing more than "petty slights or minor annoyances"). Furthermore, the Court has already found that Lynn fails to raise a genuine dispute that could suggest Lynn's performance feedback and termination was motivated by discriminatory or retaliatory animus in light of Defendants' proffered legitimate reasons. *Supra*, Sections IV(A)(2), IV(A)(5), IV(B)(2), IV(B)(5). Finally, Shaw's alleged comment on August 25, 2020, during a conversation about race relations in America in the wake of the George Floyd murder that he did "not believe in Black Lives Matter" and did not accept the concept of white privilege, Pl. Supp. Facts ¶ 15, was a stray, potentially offensive comment, unconnected to any other negative workplace impact, and is like those comments routinely found to be nonactionable for purposes of hostile work environment claims. *See, e.g.*, *Ali*, 957 F.3d at

---

[34] Whether the Court terms conduct that rises to the level of an actionable hostile work environment claim as "severe or pervasive" or "materially adverse," there "appears to be little practical difference" between these two standards. *Fennel v. Comcast Cable Comms. Mgmt., LLC*, 628 F. Supp. 3d 554, 586-87 (E.D. Pa. 2022).

181-82; *Castleberry*, 863 F.3d at 264-66; *Park v. Sec'y of United States Dep't of Veterans Affs.*, 594 F. App'x 747 (3d Cir. 2014); *Exantus v. Harbor Bar & Brasserie Rest.*, 386 F. App'x 352, 354 (3d Cir. 2010).  Therefore, Defendants are entitled to summary judgment on Lynn's hostile work environment claim.

     **D.**     **Punitive Damages**

Because Defendants are entitled to summary judgment as to all counts, the Court need not address Defendants' argument that Lynn is not entitled to punitive damages.  Mot. at 38-40.

## V.    CONCLUSION

For the foregoing reasons the Court will **GRANT** Defendants' motion for summary judgment.

Dated:  March 25, 2025

                                                Evelyn Padin, U.S.D.J.